UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DWIGHT GORDON,                    )
                                 )
          Plaintiff,             )
                                 )
v.                               )          No. 3:15-00080
                                 )          Judge Nixon/Brown
                                 )
CAROLYN W. COLVIN,               )
ACTING COMMISSIONER              )
OF SOCIAL SECURITY,              )
                                 )
          Defendant.             )

**To: The Honorable John T. Nixon, Senior United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the

final decision of the Social Security Administration (SSA) through its Commissioner, denying

plaintiff 's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under

Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*  For the reasons explained below, the undersigned

**RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be

**DENIED**, and the Commissioner's decision **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on September 14, 2011 (Doc. 10, pp. 67-70), alleging a

disability onset date of March 1, 2009 (Doc. 10, pp. 128, 134).[1]  Plaintiff claimed he was unable to

work because of heart disease, high blood pressure, depression, and obesity.  (Doc. 10, pp. 78, 87)

---

[1]  References to page numbers in the administrative record (Doc. 10) are to the page numbers that appear in
bold in the lower right corner of each page.

Plaintiff's applications for benefits were denied initially on December 15, 2011, and upon reconsideration on March 21, 2012. (Doc. 10, pp. 67-70) On April 14, 2012, plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 10, p. 90) A hearing was held in Nashville on August 6, 2013 before ALJ Elizabeth Neuhoff. (Doc. 10, pp. 33-66) The ALJ entered an unfavorable decision on September 6, 2013 (Doc. 10, pp. 9-28), after which plaintiff filed a request with the Appeals Council on September 26, 2013 to review the ALJ's decision (Doc. 10, pp. 7-8). The Appeals Council denied plaintiff's request on November 26, 2014 (Doc. 10, pp. 1-6), whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff brought this action on January 23, 2015, following which he filed a motion for judgment on the administrative record on June 1, 2015. (Doc. 14) The Commissioner responded on June 15, 2015 (Doc. 15), and plaintiff replied on June 17, 2015 (Doc. 16). This matter is now properly before the court.

## II. EVIDENCE[2]

### A. SSA Administrative Reports

Plaintiff noted in his October 20, 2011 adult function report that he takes care of his dogs, feeds them, bathes and plays with them. (Doc. 10, ¶ 8, p. 157) Plaintiff also noted that his hobbies and interests included fishing, watching television, playing pool, and playing with his grandchildren. (Doc. 10, ¶ 18, p. 160) Plaintiff added riding bicycles to his list of hobbies and interests in his second adult function report dated February 9, 2012. (Doc. 10, ¶¶ 8, 18.a, pp. 176, 179)

### B. Medical Records

The clinical records for the Vine Hill Community Clinic (Vine Hill) are before the court for

---

[2] The excerpts of the administrative record addressed below are limited to those necessary to respond to plaintiff's motion for judgment on the administrative record. The remainder of the record is incorporated herein by reference.

the period April 25, 2008 to March 26, 2013.  (Doc. 10, pp. 216-41, 344-437)  Plaintiff presented to various Vine Hill caregivers from April 25, 2008 to December 27, 2012.  (Doc. 10, pp. 223-41)  Thereafter, plaintiff was treated by Vine Hill physician, Dr. Lillian BeAird-Gaines, M.D., until March 20, 2013.  (Doc. 10, pp. 219–22, 347-48, 354-55, 358-63,  365-68)

The Vine Hill history and physical reports (the Vine Hill records) show that plaintiff presented with leg pain on August 19 and September 14, 2009 with "intermittent spells" of lower extremity weakness, numbness, and tingling.  (Doc. 10, pp. 230, 232)  Plaintiff denied "any low back pain" on the second occasion[3] (Doc. 10, p. 230), and his physical examination revealed no peripheral cyanosis,[4] edema,[5] or "CVA [cerebrovascular accident], perivertebral or bilateral hip tenderness to deep palpation."  (Doc. 10, p. 230)  Where noted in the Vine Hill records, plaintiff's gait was characterized as "normal," "symmetrical/unlabored," or "stable," and he exhibited full range of motion (ROM) in all extremities.  (Doc. 10, pp. 223, 234, 240)

The Vine Hill records show that plaintiff claimed on June 4, 2009 to having "had some depression" and anxiety, but reported neither that day.  (Doc. 10, p. 233)  Plaintiff again reported being depressed on August 9, 2010, but "[r]efuse[d] to take meds for it."  (Doc. 10, p. 223)  The Vine Hill records note the following on every other occasion: "Not Present – Anxiety, Depression . . . [and] . . . Mood changes . . . ," observations to that effect (Doc. 10, pp. 230, 238, 240), or the records are silent as to depression and/or psychiatric issues.

The Vine Hill records show that plaintiff's blood pressure ranged from normal (Doc. 10, pp.

---

[3] Apart from memorializing the visit, there are no actual treatment notes in the August 2009 record.

[4] Cyanosis – "a bluish discoloration . . . of the skin . . . ." *Dorland's Illustrated Medical Dictionary* 451 (32nd ed. 2012).

[5] Edema – "abnormally large amounts of fluid in the intercellular tissue spaces of the body . . . ." *Dorland's* at 593.

230, 236) to prehypertension[6] (Doc. 10, pp. 223, 232, 237, 238, 241) to Stage 1 hypertension (Doc. 10, pp. 227, 233-32, 240).  These Vine Hill records consistently characterize plaintiff's blood pressure as "benign hypertension, essential" (Doc. 10, pp. 224, 228, 234, 238, 240)(capitalization omitted), that the Vine Hill record dated June 6, 2008 characterized as "borderline." Notwithstanding the ups and downs of his blood pressure, plaintiff represented on four occasions that his blood pressure was controlled with medication.  (Doc. 10, pp. 228, 234, 238-39)  He also admitted he did not always take his medication.  (Doc. 10, pp. 228, 240, 356)

The Vine Hill records show that plaintiff complained of chest pain on April 25 and October 2008.  (Doc. 10, pp. 238, 241)  Plaintiff's cardiovascular examination on October 6th was normal, and an echocardiogram (ECG) that same day was characterized as both "unremarkable" and "normal." (Doc. 10, pp. 238-39)  The Vine Hill records show that plaintiff cardiovascular examinations were consistently normal.  (Doc. 10, pp. 223, 277, 230, 233)

The Vine Hill records show that plaintiff presented on December 27, 2012 for "numbness and pain in [his] left leg . . . ." (Doc. 10, p. 351)  Plaintiff represented that he was "unsure of the exact reason" for the numbness and pain, but admitted the "possibly [of] being pulled by [his] dogs ([R]otweillers)." (Doc. 10, p. 351)  Plaintiff represented that he had fatigue, back pain, left leg pain, numbness in the left leg, and depression.  (Doc. 10, p. 351)  Upon examination, plaintiff's blood pressure was 140/90, he was in no apparent distress, his gate was "[s]low and cautious,"but otherwise the physical examination was unremarkable.  (Doc. 10, p. 351)

Turning to Dr. BeAird-Gaines' records, plaintiff presented to her the first time for treatment on July 15, 2011.  (Doc. 10, pp. 221-22)  Plaintiff represented that he was depressed and anxious,

---

[6] Normal blood pressure – $\leq 120/\leq 80$; Prehypertension – 120-139/80-89; Stage 1 hypertension – 140-159/90-99; Stage 2 hypertension – $\geq 160/\geq 100$.   Http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982.

4

but he was not "amenable" to seeing a therapist. (Doc. 10, pp. 221-22) Plaintiff also claimed to have palpitations, tingling in his left arm, joint pain in his right ankle, cramps in the right foot, leg cramps, and dizziness. (Doc. 10, p. 221) On examination, plaintiff's blood pressure was 140/90, but he was under no apparent distress, his gait was "steady," and his knees exhibited full ROM and no edema. (Doc. 10, p. 221) The doctor noted that plaintiff was tender to palpation (TPP) over the lumbosacral zone bilaterally, but sacroiliac tenderness, spasms, and trigger points were absent. (Doc. 10, p. 221) The remainder of the physical examination was normal. Dr. BeAird-Gaines admonished plaintiff because of his blood pressure to cut back on Ramen noodles, fried chicken, hotdogs, hamburgers, potato chips, and sweet tea. (Doc. 10, p. 222)

Plaintiff presented again to Dr. BeAird-Gaines for treatment on August 15, 2011. (Doc. 10, pp. 219-20) Plaintiff represented that he had only "minimal" joint pain in the right ankle with ambulation, and that his previous foot cramping had "resolved." (Doc. 10, p. 219) Plaintiff reported that his depression was improved, and again declined to see a therapist. (Doc. 10, p. 220) On examination, plaintiff's blood pressure was 140/92, he was under no apparent distress, and his gait was "steady (absent limping)." (Doc. 10, p. 219) The remainder of plaintiff's physical was normal.

Plaintiff presented to Dr. BeAird-Gaines for treatment on November 25, 2011. (Doc. 10, pp. 367-68) Plaintiff represented that he had leg cramps when asleep, numbness and weakness with ambulation, and "mild" back pain. (Doc. 10, p. 367) On examination, plaintiff's blood pressure was 140/90, he was in no apparent distress, and his gait was "steady." Dr. BeAird-Gaines noted the following with respect to plaintiff's spine: "Non-tender to palpation over cervical, thoracic and lumbar Spine//Straight leg raise[7] – Complaint of mild pain in LS/Sacral zone with elevation which resolve[] when knees are flexed." (Doc. 10, p. 368) The remainder of the examination was normal,

---

[7] A positive straight leg raise is an indicator that nerve root compression/irritation is the cause of low back pain.

with the doctor noting that plaintiff's low back pain had been "resolved" with medication.  (Doc. 10, p. 368)  Dr. BeAird-Gaines performed a Ankle-Brachial Index (ABI) test, that was negative for peripheral artery disease (PAD).[8]

Plaintiff presented to Dr. BeAird-Gaines for treatment on February 8, 2012 with a complaint of leg weakness, right leg numbness, and occasional episodes of blackouts.  (Doc. 10, p. 365-66)  Plaintiff claimed to have back pain, but no other musculoskeletal issues.  (Doc. 10, p. 365)  Plaintiff's blood pressure on examination was 178/106, he was in no apparent distress, but his gait was "unsteady (at times)." (Doc. 10, p. 365)  Dr. BeAird-Gaines noted that plaintiff was TTP in the lumbosacral zone, but gross motor and strength were intact in both lower extremities (BLE).  (Doc. 10, p. 365)  The remainder of the physical was normal.  Dr. BeAird-Gaines again cautioned plaintiff to cut back on Ramen, fried chicken, hot dogs, bologna, and sweet tea.  (Doc. 10, p. 366)

Plaintiff presented to Dr. BeAird-Gaines for treatment on April 23, 2012.  (Doc. 10, pp. 363-64)  Plaintiff claimed to have back pain, joint pain in both lower extremities, muscle weakness, and depression.  (Doc. 10, p. 363)  On examination, plaintiff's blood pressure 130/96, but his gait was "steady (wide-based gait)." (Doc. 10, p. 363)  Dr. BeAird-Gaines noted that deep tendon responses (DTR), gross motor and strength were within normal limits bilaterally BLE, noting only that plaintiff had a positive straight leg raise on the right.  (Doc. 10, p. 363)  Dr. BeAird-Gaines assessed plaintiff with a lumbosacral disc disorder, but the physical examination was otherwise normal.  (Doc. 10, pp. 363-64)  Dr. BeAird-Gaines screened plaintiff for depression, and suggested that he see a therapist, but he again declined.  (Doc. 10, p. 362)

Plaintiff presented to Dr. BeAird-Gaines on July 31, 2012.  (Doc. 10, p. 358)  Plaintiff

---

[8] PAD occurs when one's extremities "don't receive enough blood flow to keep up with demand.  This causes symptoms, most notably leg pain when walking (claudation)."  Http://www.mayoclinic.org/diseases-conditions/peripheral-artery-disease/home/ovc-20167418.

complained of leg pain and/or swelling, back pain, joint pain, muscle pain, muscle weakness. (Doc. 10, p. 358) On examination, plaintiff's blood pressure was 144/96, and Dr. BeAird-Gaines noted that plaintiff admitted he had been "skipping" his blood pressure medication. (Doc. pp. 358-59) Plaintiff's gait was noted as "steady," and the remainder of plaintiff's physical examination was normal. (Doc. 10, pp. 358-59) Dr. BeAird-Gaines characterized plaintiff's cholesterol from a lipid panel collected that day as follows: "a littel [*sic*] high," but medication was "not needed, just avoid Fried foods, fast foods, and pre-packed foods as much as possible. Potato chips are a fried food." (Doc. 10, p. 407) The laboratory report notes "PATIENT NOT FASTING." (Doc. 10, p. 359)

Plaintiff presented to Dr. BeAird-Gaines for hypertension on August 27, 2012. (Doc. 10, p. 356) The doctor noted again that plaintiff reported skipping his blood pressure medications.

Plaintiff represented to Dr. BeAird-Gaines for treatment on September 17, 2012 claiming that his back and legs still hurt. (Doc. 10, p. 354) Plaintiff also reported having acid reflux after eating "certain foods like greasy foods, spicy foods . . . ." (Doc. 10, p. 354) He also represented that he felt "less depressed" with medication. (Doc. 10, p. 354) Upon examination, plaintiff's blood pressure was 152/96. (Doc. 10, p. 354) His gait was "steady (wide-based gait)," DTR, gross motor and strength were within normal limits BLE, once again with the note that plaintiff had a positive straight leg rise on the right. (Doc. 10, p. 354) Plaintiff's physical examination was otherwise unremarkable. (Doc. 10, pp. 354-55)

Plaintiff presented to Dr. BeAird-Gaines for treatment on March 20, 2013. (Doc. 10, pp. 347-48) Plaintiff represented that he was not seeing a therapist for depression, and that he "did not desire to see one." (Doc. 10, p. 347) Plaintiff also represented that he was asymptomatic for acid reflux so long as he took his medication and "monitor[ed] his diet," and that his reflux was "triggered by spaghetti, fried chicken and greasy food." (Doc. 10, p. 347) Plaintiff represented

further that he continued to have daily back pain, and numbness in his legs. (Doc. 10, p. 347) On

examination, plaintiff's blood pressure was 142/94, but he was in no acute distress. (Doc. 10, p.

347) His gait was "[s]low and cautious," but more "fluid . . . than in the past." (Doc. 10, p. 348)

Labs ordered by Dr. Beaird-Gaines on March 21, 2013 included a second lipid panel that

showed plaintiff's total cholesterol was high at 222, and his LDL cholesterol was high at 145. (Doc.

10, p. 349) The laboratory report again noted "PATIENT NOT FASTING." (Doc. 10, p. 349) Dr.

BeAird-Gaines noted that plaintiff's "total and LDL Cholesterol levels [we]re too high," and that

he needed to complete a "fasting cholesterol study . . . ." (Doc. 10, p. 391)

Dr. BeAird-Gaines wrote a letter addressed to "Dear Sir/Madam" on March 14, 2013 (Dr.

BeAird-Gaines' letter" or "the letter at issue"), quoted below in relevant part:

> This letter is written at the request of Mr. Dwight Gordan [*sic*] to
> advise you he has been a patient at our clinic since April 2008 and
> based on his clinical history it is my opinion that he is physically
> disabled and incapable of working outside his home. Mr. Gordan
> [*sic*] had several debilitating illnesses for which he has deferred
> treatment due to cost concerns; however, the nature of his medical
> conditions is such that treatment would be palliative in nature serving
> to help reduce pain, but treatment would not be expected to provide
> cure or to return patient to full functionality. A partial list of Mr
> Gordan's [*sic*] medical ailments is listed below . . . .

(Doc. 10, p. 343) Dr. BeAird-Gaines listed the following "medical ailments" in support of her

opinion: 1) "Degenerative Joint Disease, L3-L4 and L4-5"; 2) "Lumbar Spinal Osteophytosis/Bone

Spurs";[9] 3) "Lumbar Radiculopathy";[10] 4) "Joint Pain in Lower Extremities"; 5) "Depression –

recurrent episodes"; 6) "Hypertension with Concentric Left Ventricular Hypertrophy and Grade I

---

[9] Osteophytosis – Osteophytes and bone spurs are one and the same thing. *Http://www.mayoclinic.org/ diseases-conditions/bone-spurs/basics/definition/con-20024478.*

[10] Lumbar radiculopathy – "any disease of lumbar nerve roots, such as from disk herniation or compression by a tumor or bony spur, with lower back pain and often paresthesias ['abnormal touch sensation'] . . . [such as] . . . sciatica ." *Dorland's* at pp. 1383.

diastolic Dysfunction";[11,12] 7) "Hyperlipidemia"; 8) "Chest Pain – recurrent [Anxiety suspected as ER evaluations without Cardiac source identified]." (Doc. 1, p. 343)

Dr. BeAird-Gaines ordered xrays of plaintiff's knees xrays two weeks later on March 21, 2013. (Doc. 10, p. 304) The xrays were normal studies. (Doc. 10, p. 304)

Turning to the other medical evidence of record, the Nashville General Hospital (Meharry) clinical records are before the court for the period November 17, 2009 to March 11, 2013. (Doc. 10, pp. 290-342) Plaintiff presented to the Meharry neurology clinic on November 17, 2009, complaining of bilateral leg weakness. (Doc. 10, pp. 337-42) Plaintiff represented that he "walk[ed] a 160 lb. dog who pulls him." Plaintiff's blood pressure was 161/100. (Doc. 10, p. 337)

Plaintiff presented to the Meharry Emergency Department (ED) on January 17, 2012 complaining of leg pain and syncope.[13] (Doc. 10, pp. 318-36) The Meharry ED noted plaintiff's history of marijuana use, but also noted that he was in no acute distress, his physical examination was normal, and notes were made that plaintiff had full ROM in all extremities, no extremity tenderness or edema, and no radiation of pain. (Doc. 10, pp. 319-22) A CT scan that day of plaintiff's abdominal aorta was negative study with no significant abnormalities noted, as was a CT scan of his thoracic aorta. (Doc. 10, pp. 331-32) Bilateral carotid artery duplex sonograms were unremarkable as well. (Doc. 10, p. 336) An ECG also performed that day revealed mild concentric left ventricular hypertrophy, and a Grade I diastolic dysfunction (impaired relaxation), otherwise the

---

[11] Hypertrophy – "the enlargement or overgrowth of a[] . . . part due to an increase in size of its constituent cells." *Dorland's* at p. 898. Left ventricular hypertrophy – "hypertrophy of the myocardium ['the middle . . . layer of the heart wall'] of a ventricle ['the lower chamber of the left side of the heart'] of the heart, due to chronic pressure overload . . . ." *Dorland's* at pp. 898, 1222, 2048.

[12] A grade I diastolic dysfunction – A "mild" abnormality in the relaxation phase of the heart beat . . . ." *Http://www.texasheart.org/HIC/HeartDoctor/answer_2052.cfm.*

[13] Syncope – "a temporary suspension of consciousness . . . ." *Dorland's* at p. 1818.

ECG was normal. (Doc. 10, p. 333)

Plaintiff presented to Meharry department of internal medicine on July 3, 2012 for a variety of complaints, including right leg numbness and weakness. (Doc. 10, pp. 309-17) A MRI of the plaintiff's lumbar spine was obtained that date with respect to which the following impressions were noted on July 12, 2012:

> [F]irst degree spondylolisthesis[14] at the L3-L4 level with a mild anterior displacement of the L3 in relation to L4. Broad-based central posterior disc bulging noted at the L3-L4, L4-L5 and L5-S1 disc levels producing moderate central spinal stenosis[15] at these levels . . . .

(Doc. 10, p. 317)

Plaintiff was treated at Meharry's Lloyd C. Elam Mental Health Center (Elam) from August 27 to September 24, 2012. (Doc. 10, pp. 283-89) Plaintiff was diagnosed with daily Cannabis dependency, Cannabis SIMD (substance induced mood disorder), and PTSD (post traumatic stress disorder). (Doc. 10, pp. 286, 288) Plaintiff was advised to discontinue his use of Cannabis because it could "cause paranoia and . . . cause mood symptoms." (Doc. 10, pp. 288-89)

Plaintiff presented to the Meharry internal medicine clinic on March 7, 2013 – seven days before the letter at issue – on a followup for leg pain. (Doc. 10, pp. 305-08) Plaintiff represented that the pain in his legs "[r]adiates from thighs to ft. [n]umbness." (Doc. 10, p. 305) The clinical note indicates that plaintiff had positive straight leg raises bilaterally. (Doc. 10, p. 307) The clinical note also shows plaintiff admitted using Marijuana monthly, represented that he bred Rottweilers,

---

[14] Spondylolisthesis – "forward displacement . . . of one vertebra over another . . . ." *Dorland's* at 1754. First degree spondylolisthesis – the least severe form of spondylolisthesis. *Https:// clevelandclinic.org/health/diseases_ conditions/hic_your_back_and_neck/hic.*

[15] Spinal stenosis – "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina ['natural opening or passage, especially one into or through a bone'] of the lumbar spine . . . ." *Dorland's* at pp. 729, 1770.

that he had been walking three of them at once, that the dogs were 3-4 yrs. old, and that they caused his back pain by pulling on the leash. (Doc. 10, p. 305)

Plaintiff presented to the Meharry department of orthopedics for lower back pain on March 11, 2013, where he was examined by Meharry physician, Dr. Thomas O'Brien, M.D. (Doc. 10, pp. 290-303) In the history section of the March 11th clinical record, plaintiff represented that his "[s]ocial activities" included "walking, football, [and] basketball." (Doc. 10, p. 294) Plaintiff's physical examination was unremarkable, including spinal ROM. (Doc. 10, p. 292) Dr. O'Brien noted that plaintiff's gait was "nonantaligic,"[16] he had negative straight-leg raises bilaterally, Laseque's and popliteal bowstring signs were negative,[17] and he had "negative sciatic[18] notch tenderness." (Doc. 10, pp. 292-93) Dr. O'Brien's impression was that the March 7th MRI referred to above showed plaintiff had "Grade 1 L3-4 spondylolisthesis with central stenosis and neurogenic claudication,"[19] and he recommended "nonsurgical treatment." (Doc. 10, p. 293) Dr. O'Brien's neurologic examination of plaintiff's lower extremities was unremarkable. (Doc. 10, pp. 292-93)

Dr. Brannon Mangus, M.D., performed an all systems evaluation of plaintiff on January 31, 2011. (Doc. 10, pp. 209-15) Dr. Mangus's medical assessment was that plaintiff "had no impairment-related physical limitations . . . by examination today." (Doc. 10, p. 215)(bold in the original omitted) Dr. Mangus noted among other things that: 1) plaintiff used Marijuana "once or twice a month"; 2) "[h]is blood pressure was now controlled"; 3) plaintiff got out of his chair, onto

---

[16] Antalgic – "a posture or gait assumed so as to lessen pain." *Dorland's* at p. 97.

[17] Lasèque sign – a sciatica test that "exacerbates the pain in S1 radiculopathy" if positive. *Dorland's* at p. 1713. Popliteal bowstring sign – a positive test indicates lumbar radiculopathy. *Dorland's* at p. 1709.

[18] Sciatica – "a syndrome characterized by pain radiating from the back into the buttock and along the posterior or lateral aspect of the lower limb . . . ." *Dorland's* at p. 1678.

[19] Neurogenic claudication – "claudication accompanied by pain and paresthesias in the back, buttocks, and lower limbs . . . usually caused by lumbar spinal stenosis . . . ." *Dorland's* at p. 369.

and off the examination table without difficulty; 4) his strength was 5/5 in all muscle groups; 5) there was no spinal tenderness or spasms, nor were there any bony abnormalities upon palpation; 6) he had full range of motion (ROM) "universally"; 6) his Babinski reflex,[20] Tinel sign,[21] Romberg Test,[22] and straight leg raises all were normal. (Doc. 10, pp. 210, 212-14)

Zachary Tureau, Ph.D. interviewed plaintiff consultively on November 21, 2011 to assess his alleged depression. (Doc. 10, pp. 251-56) Dr. Tureau noted that plaintiff "used marijuana several times per week," but ultimately concluded that there was "no evidence" that his depression "render[ed] him unemployable." (Doc. 10, pp. 252, 254)

### III. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

---

[20] Babinski Reflex – a positive test is "a sign of a lesion in the central nervous system . . . ." *Dorland's* at p. 1611.

[21] Tinel Sign – a positive test "indicates a partial lesion or the beginning regeneration of the nerve." *Dorland's* at p. 1716.

[22] Romberg Test – a positive test demonstrates the "loss of position sense . . . ." *Dorland's* at p. 1715.

# IV.  ANALYSIS

## A.  Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards.  42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374.  Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2003).  The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

## B.  Claims of Error

### 1.  Whether the ALJ Erred in Not Giving Controlling Weight to Dr. BeAird-Gaine's Opinion (Doc. 10, pp. 6-8)

Plaintiff argues that the ALJ erred in not giving controlling weight to Dr. BeAird-Gaines' letter.  The ALJ's explanation for giving Dr. BeAird-Gaines' letter "little weight" is quoted below in its entirety:

> A letter submitted by the claimant's primary care provider at Vine Hill states that the claimant is 'physically disabled and incapable of working outside his home.'  Exhibit 11F.  However the undersigned gives this letter little weight for three reasons: 1) it was written at the request of the claimant, and the claimant's doctor may have therefore felt the need to assist the claimant; 2) a finding of disability is outside the expertise of the claimant's primary care provider; and 3) there is no objective medical evidence or documentation to support the conclusory statements reflected in the letter.

(Doc. 10, p. 25)

Under the standard commonly called the "treating physician rule," the ALJ is required to

13

give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). The ALJ "is not bound by a treating source's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health and Human Serv's*, 25 F.3d 284, 287 (6th Cir. 1994). That said, the ALJ is required to provide "good reasons" for discounting the weight given to a treating-source's opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

The ALJ's first reason is not a good reason for not giving Dr. BeAird-Gaines' opinion controlling weight. The undersigned is unaware of any regulations or case law prohibiting Social Security claimants from requesting a medical source statement or opinion from their treating physician to support a claim for benefits. On the contrary, it is incumbent on them to do so.

As for the ALJ's second reason, the law is well established that the question of disability, and a claimant's ability to work is a decision "reserved to the Commissioner" who has exclusive authority in that regard. 20 C.F.R. § 404.1527(d)(1). If the ALJ's second reason reflected all that Dr. BeAird-Gaines' said in the letter at issue, then the ALJ's second reason would constitute a good reason not to give her opinion controlling weight, and the claim of error would be deemed without merit on its face. However, Dr. BeAird-Gaines relied on the eight conditions/symptoms enumerated above as the basis of her opinion. Therefore, the ALJ's second reason does not constitute good reason not to give Dr. BeAird-Gaines' opinion controlling weight.

Finally, there is the ALJ's third reason. The ALJ's third reason not only is a good one, it is sufficiently specific to make it clear to subsequent reviewers why he did not give Dr. BeAird-Gaines' opinion controlling weight. The only question is whether the ALJ's third reason is supported by substantial evidence.

■ Dr. BeAird-Gaines opined that plaintiff was unable to work due to degenerative joint disease at L3-L4 and L4-L5. As previously discussed, plaintiff represented several times to Dr. BeAird-Gaines that he had low back pain. However, Dr. BeAird-Gaines never verified plaintiff's subjective representations through medically acceptable clinical and/or laboratory diagnostic techniques. She merely recorded those subjective representations.

As for other evidence, Dr. Mangus determined upon examination that there was no spinal tenderness, spasms, or bony abnormalities upon palpation, and that plaintiff had full ROM in his back. As for the last point, the record shows that plaintiff exhibited full ROM in his back at least five times between June 4, 2009 to March 11, 2013, the last date being just three days before the letter at issue. The 2012 Meharry MRI also showed only mild to moderate abnormalities. Mild and moderate conditions/symptoms are not disabling. Finally, Dr. O'Brien noted that plaintiff had the mildest form of spondylolisthesis, and his multi-faceted examination of plaintiff's lower back was unremarkable.

Analysis of plaintiff's low back pain would be incomplete without addressing plaintiff's admitted activities. Specifically, plaintiff admitted in his 2011 adult function report that he cared for his dogs, fed them, bathed them, and played with them. He also admitted that he went fishing, played pool, and played with his grandchildren. Plaintiff added riding bicycles in his 2012 adult function report. Plaintiff also admitted that he routinely walks his dogs, sometimes three at once, that the dogs are 3-4 year old Rottweilers, and at least one of them weighed 160 lbs. Just seven days

before the letter at issue, plaintiff admitted that his dogs pulling on the leash caused his back pain. Finally, just three days before the letter at issue, plaintiff added "walking, football, [and] basketball" to his social activities. Plaintiff's admitted activities delineated above are inconsistent with the view that he is unable to work because of degenerative joint disease at L3-L4 and L4-L5.

As shown above, Dr. BeAird-Gaines' opinion that plaintiff was unable to work because of degenerative joint disease at L3-L4 and L4-L5 is not supported by the evidence.

■ Dr. BeAird-Gaines opined that plaintiff was unable to work because of lumbar spinal osteophytosis/bone spurs. The record shows that Dr. BeAird-Gaines did not assess/diagnose plaintiff with lumbar spine osteophytosis/bone spurs, although she did report from time to time that plaintiff's lumbar spine was TTP. The record also shows that no other medical provider assessed/diagnosed plaintiff with osteophytosis/bone spurs, although they too reported on occasion that plaintiff's lumbar spine was TTP.

As for other evidence, Dr. Mangus noted specifically in 2011 that plaintiff had no bony abnormalities upon palpation, and the July 2012 Meharry MRI did not reveal osteophytosis/bone spurs. Nor did Dr. O'Brien make any mention of osteophytosis/bone spurs in his detailed examination of plaintiff's spine in 2013. Indeed, the only mention of osteophytosis/bone spurs in the medical record is in the letter at issue. Plaintiff's admitted activities also are inconsistent with the view that he is unable to work because of osteophytosis/bone spurs.

As shown above, Dr. BeAird-Gaines' opinion that plaintiff was unable to work because osteophytosis/bone spurs is not supported by the evidence.

■ Dr. BeAird-Gaines opined that plaintiff was unable to work because of lumbar radiculopathy. Dr. BeAird-Gaines reported that plaintiff had positive straight-leg raises on the right three times over the nine-plus month period from November 2011 to September 2012. However,

she never assessed/diagnosed plaintiff with lumbar radiculopathy. Although plaintiff demonstrated positive straight-leg raises to other medical providers, none of them assessed/diagnosed plaintiff with lumbar radiculopathy.

As for other evidence, Dr. Mangus noted in 2011 that plaintiff had full ROM universally, and that plaintiff's Babinski reflex, Tinel sign, and straight leg raises all were normal. Plaintiff presented for treatment at the Meharry ED in January 2012 for leg pain and syncope, but reported that the pain was "localized," not radiating. The later 2012 MRI of plaintiff's lumbar spine also did not reveal lumbar radiculopathy.[23] Dr. O'Brien's detailed neurological examination of plaintiff's lower extremities also was unremarkable. Plaintiff's admitted activities also are inconsistent with the view that he is unable to work, this time due to lumbar radiculopathy.

As shown above, Dr. BeAird-Gaines' opinion that plaintiff was unable to work because of lumbar radiculopathy is not supported by the evidence.

■ Dr. BeAird-Gaines opined that plaintiff was unable to work because of joint pain in lower extremities. The record shows that plaintiff represented several times to Dr. BeAird-Gaines that he had lower extremity limb pain, joint pain, cramps, weakness, and numbness. Dr. BeAird-Gaines' records reveal that plaintiff was never in any apparent distress, his gait was steady with the exception of February 8, 2012 and March 20, 2013, when his gait was "unsteady" and "slow and cautious" respectively, his DTR, gross motor and strength were intact bilaterally BLE, and in those instances where noted, he exhibited full ROM and no edema. Apart from the ABI on November 25, 2011, which was negative for PAD, Dr. BeAird-Gaines did not obtain any objective medical evidence with respect to plaintiff's alleged lower extremity pain.

---

[23] MRIs are used to confirm a diagnosis of lumbar radiculopathy. *See http://www.spine-health.com/ conditions/lower-back-pain/lumbar-radiculopathy*.

As for other evidence, the record shows that plaintiff was treated for leg pain three times at Vine Hill.  Although there are no clinical observations recorded in the record of the first visit, examination on the second visit was entirely normal with no peripheral abnormalities noted and, on the third visit, plaintiff admitted that his leg pain was "possibly" due to walking his Rottweilers. The opinions/findings of Drs. Mangus and O'Brien also are inconsistent with the notion that plaintiff was unable to work because of joint pain in the lower extremities.

Plaintiff also presented to the Meharry ED in January 2012 with complaints of leg pain and syncope.  However his physical exam was normal in all respects.  He had full ROM in all extremities, no extremity tenderness or edema, and no radiation of pain.  Two CT scans, bilateral carotid artery sonograms, and an ECG ordered in response to plaintiff's complaints were normal. The MRI obtained at Meharry in July 2012 in response to plaintiff's complaint of right leg numbness and weakness revealed only mild to moderate abnormalities.  As for the xrays of plaintiff's knees taken at Meharry, they were normal.  Plaintiff's admitted activities also are inconsistent with the view that he is unable to work due to lower extremity joint pain.

As shown above, Dr. BeAird-Gaines' opinion that plaintiff is unable to work because of joint pain in the lower extremities is not supported by the evidence.

■ Dr. BeAird-Gaines opined that plaintiff was unable to work because of depression. Plaintiff represented twice to Dr. BeAird-Baines that he was depressed, and five times that he was not depressed, or that or that his depression had improved.  Dr. BeAird-Gaines screened plaintiff for depression in April 2012, but plaintiff declined to see a therapist on that date and three other occasions, before and after.  Apart from plaintiff's inconsistent subjective representations, and Dr. BeAird-Gaines' one-time assessment based on those same subjective representations, there is nothing in Dr. BeAird-Gaines' records that support the notion that plaintiff suffered from depression.

As for other evidence, the four-plus years represented by the Vine Hill records reveal that plaintiff complained to be depressed twice early on, but denied depression on each and every other occasion until December 2012 when he claimed to be feeling depressed again. Plaintiff refused to take medication for his alleged depression while under Vine Hill's care. Plaintiff also was treated at Elam, where he was diagnosed with Cannabis dependency, substance induced mood disorder, and advised to discontinue Cannabis because it could cause paranoia and mood disorders. Finally, Dr. Tureau concluded upon examination that plaintiff's depression did not render him unemployable.

As shown above, Dr. BeAird-Gaines' opinion that plaintiff is unable to work because of depression is not supported by the evidence.

■ Dr. BeAird-Gaines opined that plaintiff was unable to work due to "Hypertension with Concentric Left Ventricular Hypertrophy and grade 1 diastolic Dysfunction." Turning first to plaintiff's hypertension, the record shows that plaintiff's blood pressure was up and down during the relevant period. Of the twenty-five blood pressure readings in the record, sixteen were under or equal to the June 6, 2008 "borderline" reading of 140/90, eight were over, some only slightly, and three reflected Stage 2 hypertension. On March 11, 2013, just four days after the highest reading in the record of 184/94, and three days prior to the letter at issue, plaintiff's blood pressure was again down to a "borderline" 134/71.

The record shows that plaintiff's blood pressure was normal to Stage 1 hypertensive ("borderline") 88 percent of the time, and Stage 2 hypertensive 12 percent of the time. The three incidences of Stage 2 hypertension occurred in November 2009, February 2012, and March 2013, *i.e.*, more than 2 yrs. between the first and second occurrence, and more than 1 yr. between the second and third. Plaintiff's Stage 2 hypertension had not lasted a continuous period of 12 months or more at the time of the letter at issue, nor was it likely based on the record that it would last for

19

a continuous 12 months or more. Such random incidents of Stage 2 hypertension do not support Dr. BeAird-Gaine's opinion that plaintiff was unable to work due to hypertension.

Turning to Dr. BeAird-Gaines' opinion that plaintiff was unable to work because of "Concentric Left Ventricular Hypertrophy and grade 1 diastolic Dysfunction," the January 17, 2012 ECG characterized plaintiff's "concentric left ventricular hypertrophy" as a "mild" condition. As noted above at p. 9 n. 12, a "grade 1 diastolic Dysfunction" also is a mild abnormality. Mild abnormalities are not disabling.

As shown above, Dr. BeAird-Gaines' opinion that plaintiff is not able to work due to hypertension with concentric left ventricular hypertrophy and grade 1 diastolic dysfunction is not supported by the evidence.

■ Dr. BeAird-Gaines opined that plaintiff was unable to work because of hyperlipidemia. As previously discussed, Dr. BeAird-Gaines characterized plaintiff's cholesterol as "a littel [*sic*] high" in July 2012, adding that medication was "not needed." Dr. BeAird-Gaines noted that the "total and LDL cholesterol levels are too high" following a second lipid panel in March 2013, and instructed plaintiff to complete a "fasting cholesterol study" in two months. The record before the court shows that Dr. BeAird-Gaines did not treat plaintiff again after March 2013, and there is no other cholesterol-related evidence in the record.

Treatment for high cholesterol is not an arcane subject. It is a common condition that is familiar to virtually every medical practitioner alive, and to a huge segment of the general population. For example, it is common knowledge that, to treat high cholesterol, a doctor must first determine whether a patient has high cholesterol. A doctor does so by way of a lipid panel such as those obtained in July 2012 and March 2013. It also is common knowledge that the patient must fast

for 12 hrs. prior to the test to eliminate misleadingly high readings.[24]  Plaintiff did not fast before either of the lipid panels in the record.[25]  A reasonable physician in Dr. BeAird-Gaines' place would not have concluded from such scant/unreliable medical evidence that plaintiff was unable to work due to high cholesterol.

As shown above, Dr. BeAird-Gaines' opinion that plaintiff is unable to work due to hyperlipidemia is not supported by the evidence.

■ Dr. BeAird-Gaines opined that plaintiff was not able to work due to recurrent chest pain. Dr. BeAird-Gaines' records reveal that plaintiff never complained of chest pain to her.  On the contrary, Dr. BeAird-Gaines specifically noted on six occasions that chest pain was "Not Present." Moreover, his cardiovascular, chest and lung examinations were normal on every occasion that he presented for treatment.

As for other medical evidence, the Vine Hill history and physical reports show that plaintiff complained of chest pain twice during the first four months of the nearly five years represented by those records.  An ECG in October 2008 was characterized as both "unremarkable" and "normal." A second ECG in January 2012 was unremarkable, with only mild abnormalities.

Dr. BeAird-Gain's opinion that plaintiff was unable to work because of chest pain is not supported by the evidence.

* * *

As shown above, Dr. BeAird-Gaines' opinion was not supported by medically acceptable clinical and/or laboratory diagnostic techniques, it was not supported by her own medical records, and it was inconsistent with other substantial evidence on each and every point.  Because an ALJ

---

[24] *Http://my.cleveland.org/services/heart/diagnostics-testing/laboratory-tests/lipid-blood.tests.*

[25] What is surprising is that plaintiff's cholesterol was not considerably higher given his preference for Ramen noodles, fried chicken, hotdogs, hamburgers, bologna, and potato chips.

is not required to give controlling weight to a treating source's opinion under such circumstances, plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Failed to Consider All of Plaintiff's
### Severe Impairments at Step Two
### (Doc. 10, pp. 9-10)

Plaintiff argues that the ALJ failed to consider all of his severe impairments at step two, and that she failed to provide sufficient reasons for not finding those impairments to be severe. The record reveals that the ALJ did not include "lumbar spinal osteophytosis/bone spurs and lumbar radiculopathy" as severe impairments at step two, nor did she explain why she did not.

At most, an ALJ's failure to include these additional conditions as severe impairments constitutes harmless error, because the ALJ determined that plaintiff had other severe impairments that permitted plaintiff to clear step two. *See Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008)(citing *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)(failure to find that an impairment was severe at step two was harmless error where other impairments were deemed severe). Plaintiff's second claim is without merit.

### 3. Whether the ALJ Erred in Not Properly
### Considering Plaintiff's Obesity
### (Doc. 10, pp. 10-11)

Plaintiff argues that the ALJ erred in not properly considering his obesity in her decision. "Although obesity [i]s no longer a separately listed impairment under step three, the Commissioner [has] explained that obese claimants can still prevail at step three by proving that their obesity combined with other ailments equals the severity of a different listed impairment." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 644 (6th Cir. 2006)(citation omitted). However, SSR 02–01p does not require the ALJ to use any "particular mode of analysis," but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the

sequential evaluation. *Shilo v. Comm'r of Soc. Sec.*, 600 Fed.Appx. 956, 959 (6th Cir. 2015)(citing *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411-12 (6th Cir. 2006)).

The ALJ determined that obesity was one of plaintiff's severe impairments at step two of the analysis, and demonstrated that SSR 02-01p controlled when she concluded that "[t]here is no indication in the record . . . that the claimant's obesity, whether analyzed individually or in combination with another impairment, meets or medically equals the criteria for any listing." (Doc. 10, p. 15) The record also shows that plaintiff acknowledged plaintiff's obesity in the RFC assessment. (Doc. 10, p. 19) The ALJ noted that Dr. Mangus concluded plaintiff's "ability to walk, twist, turn, bend, and lift was not adversely affected by his obesity." (Doc. 10, p. 20) However, the ALJ gave greater weight to Dr. Curtsinger's RFC assessment because his opinion "reflect[ed] that the claimant can never climb ladders, ropes, or scaffold which is consistent with his obesity." (Doc. 10, p. 25)

As shown above, the ALJ considered plaintiff's obesity at all relevant stages of the sequential examination. Therefore, plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Erred by Not Including a Function-by-Function Assessment in the RFC Analysis (Doc. 10, pp. 11-12)

Plaintiff argues that the ALJ did not make a function-by-function assessment in the RFC. "'Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,' as there is a difference 'between what an ALJ must consider and what an ALJ must discuss in a written opinion.'" *Beason v. Comm'r of Soc. Sec.*, 2014 WL 4063380 * 13 (E.D. Tenn. 2014)(citing *Delgado v. Comm'r of Soc. Sec.*, 30 Fed.Appx. 542, 547 (6th Cir. 2002)). SSR 96-8p "does not state that the ALJ must discuss each function separately in the narrative of the ALJ's decision." *Beason*, 2014 WL at *13.

A plain reading of the ALJ's decision shows that she did not compare and contrast each of plaintiff's alleged limitations in her narrative. However, the ALJ noted at least six times that, in reaching her decision, she considered the entire record/all the evidence of record. (Doc. 10, pp. 13-14, 17-19) That was all the ALJ was required to do. Therefore, plaintiff's fourth claim of error is without merit.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's amended motion for judgment on the administrative record (Doc. 14) be **DENIED**, and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 6th day of June, 2016.


/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge